**Poznansky v Bell**

2024 NY Slip Op 32311(U)

July 8, 2024

Supreme Court, Kings County

Docket Number: Index No. 519851/2020

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
----------------------------------------------------------------------------X
IRINA POZNANSKY, as Attorney-in-Face for PAVEL
POZNANSKY, also known as PAUL POZNANSKY,

      Plaintiff,

  -against-

TIMOTHY BELL, M.D., HILLARY CLARKE, M.D., RATTAN
PATEL, M.D. and NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION,

      Defendants.
----------------------------------------------------------------------------X
**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

**DECISION & ORDER**

 Index No. 519851/2020

 Mo. Seq. 2

Recitation, as required by CPLR § 2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u> 68-92

Defendants Hillary Clarke, M.D. ("Dr. Clarke") and Rattan Patel, M.D. ("Dr. Patel") move (Seq. No. 2) for an Order, pursuant to CPLR § 3212, granting summary judgment and dismissing all claims and causes of action against defendants Dr. Clarke and Dr. Patel. Plaintiff opposes this motion.

Plaintiff Irina Poznansky commenced this action on October 15, 2020, as Attorney-in-Fact for Pavel Poznansky, a/k/a Paul Poznansky, alleging claims of medical malpractice and negligence in connection to the diagnosis and treatment of a stroke which allegedly caused Paul Poznansky to sustain permanent neurological injuries (*see* Exhibit G).

On October 1, 2019, Paul Poznansky (hereinafter "Patient"), a 59-year-old male, was brought by ambulance to Coney Island Hospital (renamed South Brooklyn Health), after experiencing an episode of dizziness/weakness while playing racquetball. Patient arrived at 9:28 p.m. and was first seen in the Emergency

[* 1]

Department ("E.D.") at or around 9:32 p.m. During the relevant times of Patient's treatment, Dr. Patel was the MICU attending physician and Dr. Clarke was called for a Neurology consult.

At 9:44 p.m. a CT scan of the head was ordered by Bhojnarine Seeram, M.D. ("Dr. Seeram"), an E.D. Resident in response to Patient's complaints of dizziness and right sided weakness (*see* Exhibit L, at 2-3).

At 9:45 p.m., a consultation note was authored by Neurology Resident, Magdy Saad Michael, M.D., ("Dr. Michael") under the direction of moving Defendant Dr. Clarke (*id.,* at 14-16). This initial assessment revealed Patient was "aphasic and had facial asymmetry with right sided weakness." It was noted that he was "unable to smile on the right side of face" and could move his right arm but not his right leg (*id.,* at 6). Vitals were documented to be within normal limits, and, upon examination, Patient could understand what was asked, but could only respond with "yes/no" answers (*id.)*.

At 9:49 p.m., a stroke code was called by Dr. Michael, following the standard protocol in effect at Coney Island Hospital ("CIH") for presumed stroke patients in 2019 (Dr. Clarke deposition tr, at 25-28). This protocol (i.e. "Stroke Plan") indicates the steps to be taken when a patient presents with a stroke, which at the time required CIH staff to first obtain a CT scan, and if the scan is negative for a bleed, to administer tPA (tissue plasminogen activator), and then to order a CT angiogram ("CTA"). As articulated by Dr. Clarke, the head of the stroke unit at CIH, in his deposition, these steps should be taken as soon as possible (*id.,* at 33).

At 9:50 p.m., Dr. Seeram ordered lab work including a complete blood count with differential and a basic metabolic panel (*id.,* at 23). At 10:08 p.m., blood was drawn for the lab.

The head CT, ordered earlier by Dr. Seeram, was resulted at 10:35 p.m. and revealed no hemorrhage. Dr. Michael's consult, post-CT, noted an improvement after a neurological exam—Patient still presented with facial droop and difficulty speaking, but showed improved strength. His NIH stroke score, which was initially an 8, was upgraded to a 5 (*id.,* at 14-15).

Sometime between 9:49 p.m. and 10:20 p.m. on October 1, defendant Dr. Clarke spoke on the phone with Dr. Michael and with Dr. Ostrovsky, the E.D. attending. In his deposition, Dr. Clarke testified that during this conversation, he learned that based on the negative head CT, Dr. Ostrovsky was going to administer tPA.

2

After completion of the CT scan, tPA therapy was ordered by Dr. Seeram from the E.D and the initial IV bolus administered from 10:20 p.m. to 10:23 p.m. Following the initial bolus infusion of tPA, a continuous infusion of tPA was administered at 10:23 p.m., the dosage of which was based upon Patient's confirmed weight (*id.,* at 33-34).

At 10:18 p.m., an E.D. progress note authored by Dr. Ostrovsky stated he had spoken with a member of the Neurovascular team at NYU Langone Hospital. He was advised to administer tPA and admit the Patient to the Medical Intensive Care Unit ("MICU"), but to transfer him to a tertiary facility if there were "any problems or if the patient deteriorates" (*id.,* at 5).

At 10:31 p.m. Patient was admitted as an inpatient under the service defendant Dr. Patel in the MICU (*id.,* at 50). Patient was to be admitted to the MICU for observation for twenty-four hours, with vital signs checked every fifteen minutes for two hours, then every thirty minutes for six hours and then every hour for the remainder of sixteen hours (*id.*) At this time, a head/neck CTA with contrast, a carotid sonogram, and echocardiogram were ordered, with neuro checks and vital signs to be monitored per stroke protocols (Dr. Clarke deposition tr, at 18). However, the CTA was not performed until 1:27 a.m. and resulted at 2:48 a.m. on October 2, 2019 (Exhibit L, at 33-34).

At 11:34 p.m. Dr. Patel ordered a LIPID Panel and an ECG (29,50). At 11:50 Dr. Patel ordered an SLP evaluation when the Patient demonstrated difficulty swallowing with acute neuromuscular changes (Exhibit L, at 51-52). An update of the Patient's symptoms was recorded by Dr. Patel, at 12:56 a.m. on October 2, 2019, but he did not mention whether the CTA had been ordered or performed at this time.

From 1:27 a.m. to 2:05 a.m. on October 2, 2019, CTA scans of the head and neck were completed and interpreted by co-defendant Timothy Bell, M.D. ("Dr. Bell"), who was working remotely. Dr. Bell dictated his report on October 2 at 2:48 a.m. EST[1] finding "no evidence of aneurysm or dissection."

---

[1] The interpretation is time stamped at 11:48 p.m. PST, which is 2:48 a.m. EST.

[* 3]

A review of the submissions indicates that there are no vital signs or assessments concerning Patient's condition, recorded between 12:47 a.m. and 3:52 a.m. on October 2. Additionally, no blood pressure measurements (BPs) were recorded between these times.

At approximately 3:52 a.m. Patient was seen by MICU resident, Dr. Taunk. At 3:57 a.m., 3:59 a.m. and 4:03 a.m. Patient's blood pressure was elevated at 171/102 and a pulse of 91, according to Dr. Taunk's notes. It was recommended, in accordance with the Stroke Plan, that Patient undergo neuro checks every two hours, with monitoring for epistaxis, diaphoresis, change in mental status, or new onset headache, and maintenance of blood pressure between 140-160/80-90 (*id.,* at 3).

In a note that was signed at 4:30 a.m., Dr. Patel indicated that he had seen the Patient and discussed his condition with Dr. Taunk. At 5:28 a.m., a note authored by Dr. Patel stated that the plan was to continue monitoring. Dr. Patel's notes make no mention of the Patient's elevated BP levels at this time. Patient's BP remained elevated, outside of the prescribed/recommended range until approximately 8:00 a.m.

Dr. Clarke first saw Patient himself at some time between 6:30 a.m. and 7:00 a.m. on October 2, 2019. After conducting a neurological exam, Dr. Clarke's impression was that Patient had an acute left MCA (Middle Cerebral Artery) stroke (Dr. Clarke deposition tr, at 73).

Dr. Clarke then asked Dr. Ekbote, the on-call radiologist, to review the CTA results from earlier that morning. At around 7:00 a.m., after reviewing the scans, Dr. Ekbote determined in contrast to Dr. Bell's report that there had been a "complete left ICA stroke" and concluded that Patient should be transferred to a tertiary facility immediately (*id.*, at 80-81). These findings were further discussed with the neuro-interventionalist, who suggested obtaining a follow-up urgent head CT scan and, if there was no bleed, plaintiff would be accepted for transfer to NYU Langone Brooklyn Lutheran Hospital as soon as possible.

At 8:31 a.m., a repeat head CT was performed to determine whether there had been a new stroke. At approximately 9:50 a.m., the results were reviewed by Dr. Clarke, whose impression was an acute MCA stroke with recommendation to rule out carotid dissection and hemorrhagic transformation (Exhibit L, at 17). Dr. Clarke then began to arrange for Patient's transfer to NYU Langone Hospital Brooklyn.

At approximately 11:00 a.m. on October 2, 2019, Patient was transferred to the NYU Langone Hospital Brooklyn. At the time of transfer, Patient was alert but unable to communicate, with facial droop and right-side weakness (*id.,* at 19).

Plaintiff alleges that Dr. Clarke deviated from good and accepted medical practice by failing to ensure the timely performance of the CTA (angiogram), as recommended by the Stroke Plan. Plaintiff alleges a timely CTA would have indicated a need for an immediate transfer to an appropriate tertiary facility, rather than delaying Patient's transfer to NYU Langone until 11:00 a.m. the next morning, a delay of 12 hours to receive appropriate treatment.

Plaintiff also alleges that Dr. Patel deviated from good and accepted medical practice by failing to "closely monitor" Patient after the administration of the tPA, or directing his resident Dr. Taunk to do so*,* as evidenced by the lack of vital signs recorded between approximately 1:00 a.m. and 4:00 a.m. on October 2, 2018, and the lack of any progress notes from the time Patient returned from the CTA at 2:07 a.m. and 4:00 a.m. Further, plaintiff claims that even when the ordered assessments were finally performed at around 4:00 a.m., no notice or action seems to have been undertaken by Dr. Patel or his resident in the face of Patient's BP, which was markedly elevated at 171/102.

Plaintiff alleges that these departures caused and/or contributed to the injuries ultimately sustained by the Patient. Following October 1, Plaintiff has been treated for extended periods at Coney Island Hospital, NYU Langone, Rusk/Brooklyn, Arch Care, and Silver Lake Rehabilitation. He has been confined to bed and home to date, except for necessary medical care and hospitalizations.

Generally, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (*Stukas v Streiter,* 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:

> "The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's

[* 5]

injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (*Barnaman v Bishop Hucles Episcopal Nursing Home,* 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).

In support of this motion, movants submit an expert affirmation from Mark S. Silberman M.D., a practicing physician board certified in Emergency Medicine, Critical Care Medicine, Pulmonary Medicine, and Internal Medicine ("Dr. Silberman"), as well as medical records and deposition transcripts. The court accepts Dr. Silberman as an expert in the stated fields.

Based on review of the record, Dr. Silberman opines that the care and treatment rendered by Dr. Clarke and Dr. Patel was in accordance with the accepted medical standards for recognizing an evolving stoke which he opines was "quickly recognized" at CIH on October 1, 2019. He opines that Dr. Clarke's did not deviate from the standard of care as to the timely performance of the stroke protocol, stating that a "timeframe of twenty-one (21) minutes to perform a STAT CT scan was reasonable and appropriate." He also opines that tPA was the correct form of treatment and was administered in an acceptable timeframe.

With respect to Dr. Patel, Dr. Silberman opines that he was only "tangentially involved in plaintiff's care as the MICU attending awaiting transfer from the ED," and that Dr. Patel's limited involvement in plaintiff's care is further supported by his deposition being waived. Dr. Silberman states that Dr. Patel's plan—which was to continue to monitor Patient post-tPA for twenty-four (24) hours, with serial neuro exams and, if symptoms worsened, to consult neurology—was entirely appropriate considering the circumstances.

6

[* 6]

Dr. Silberman further opines as to proximate causation of the plaintiff's alleged injuries, stating:

"It is my opinion to a reasonable degree of medical certainty that none of the alleged acts or omissions on behalf of Dr. Clarke or Dr. Patel was a proximate cause of plaintiff's claimed injuries. As there is no credible evidence that plaintiff's injuries and subsequently claimed injuries resulted from improper care and treatment provided by Dr. Clarke or Dr. Patel, then there are no acts or omissions attributable to the moving Defendants that could have caused or contributed to the claimed injuries."

The Court finds that movants fail to establish their prima facie burden. Dr. Silberman's expert affirmation consists of conclusory statements, unsupported by any competent evidence and does not refute many of the specific allegations of negligence made by plaintiff.

Specifically, Dr. Silberman's claim that there were no departures on behalf of Dr. Clarke in plaintiff's care is unsupported by any competent evidence. He states that the CT and subsequent administration of tPA were both performed in a timely manner, in accordance with the accepted standard of care, but does not mention the CTA and whether it was performed in a timely manner.

Dr. Silberman's opinion that there were no departures on behalf of Dr. Patel in Patient's care is also insufficient. Specifically, he does not acknowledge the gaps in Patient's records, nor does he respond to plaintiff's claim that the "failure to closely monitor the Patient after the administration of tPA, as evidenced by the lack of vital signs… and the lack of any progress notes after the Patient returned from CTA," was a departure from the standard of care. The expert does not address the claims that a failure to monitor the Patient is evidenced by the lack of vital signs recorded between 12:47 a.m. and 3:57 a.m., no nursing notes from 12:53 a.m. to 6:41 a.m., and no E.D. provider notes from 12:56 a.m. to 4:00 a.m. (Exhibit L, at 5-10, 80).

Dr. Silberman's affirmation also does not acknowledge plaintiff's claim regarding the lack of response or action taken by Dr. Patel, when Patient's BP was recorded at 171/102 at 4:00 a.m. on October 2, 2019, which was elevated and outside of the anticipated range.

Finally, Dr. Silberman's opinion does not provide any support for his conclusions as to causation. The expert affirmation mentions "proximate cause" twice, but both are superficial and unsupported opinions. There

7

[* 7]

is no discussion of plaintiff's claim that Dr. Clarke and Dr. Patel's alleged acts or omissions in treating the patient proximately caused the claimed injuries.

In sum, the moving party's submissions are insufficient to establish a prima facie showing that defendants are entitled to a judgment as a matter of law. Dr. Silberman's expert affirmation does not meet the prima facie burden with respect to alleged departures from the standard of care by Dr. Clarke and Dr. Patel, nor do they meet the prima facie burden with respect to the proximate causation of Patient's alleged injuries.

Even assuming the defendants had established their prima facie burden, plaintiff's opposition raises multiple triable issues of fact with respect to both the standard of care and proximate cause.

In opposition, plaintiff submits an expert affirmation from a licensed physician certified in emergency medicine (name of expert redacted). The Court was presented with the signed, unredacted affirmation for *in camera* inspection. Plaintiff's expert, a licensed physician board certified in Emergency Medicine, avers that they have experience with the medical issues involved in this suit, including as an Associate Director of Emergency Medicine at a hospital designated as a Stroke Center by the New York State Department of Health. The expert also avers that they are familiar with the standards of accepted practice for diagnosing and treating strokes as they existed in 2019. As such, the Court finds that plaintiff's expert has established the qualifications to render an opinion on the care and treatment at issue.

Plaintiff's expert opines that Dr. Clarke, in failing to ensure the CTA was performed immediately after the head CT, departed from the standard of accepted care in his treatment of the Patient. Notably, plaintiff's expert opines that the issue was not Dr. Clarke's plan/recommendation—which was within the standard of care—but rather that it was never implemented, thereby causing and/or contributing to the permanent, life-altering injuries Patient suffered. Plaintiff's expert opines that Dr. Clarke had a duty to inquire about the status of the CTA scan that he had directed be done, but he failed to do so during his two conversations with Dr. Michael and Dr. Ostrovsky after the CT had been resulted, which the expert opines represents a departure in accepted practice. The expert states that had Dr. Clarke inquired about the CTA, he would have learned that it had not yet been completed and could have taken measures to ensure its completion.

8

[* 8]

Plaintiff's expert further opines that Dr. Clarke not ascertaining whether the CTA of head and neck had been performed led to a delay of approximately three hours between the performance of the head CT and the CTA[2], which constituted a departure from accepted medical practice. Plaintiff's expert notes that, had the CTA been appropriately performed between 9:44 p.m. and 10:35 p.m., the Patient's transfer to a tertiary care facility could have been accomplished approximately twelve hours earlier than it occurred.

As to Dr. Patel, plaintiff's expert opines that his failure to adequately monitor Patient, or direct his resident Dr. Taunk to do so, and report his condition in a timely manner, represented a departure from accepted standard of care which caused and/or contributed to the injuries ultimately sustained by the Patient. The expert opines that acts or omissions of Dr. Patel, who was called in for "close monitoring" of the Patient after tPA had been administered, represented a departure from accepted medical practice. Specifically, plaintiff's expert notes that, under Dr. Patel's care, Patient's vital signs were not recorded from 12:57 a.m. to 3:52 a.m. on October 2. He also notes that Patient's BP was recorded around 4:00 a.m., it was 171/102, which exceeded the "permissive hypertension" enumerated in the recommendations of Dr. Clarke and Dr. Michael. Plaintiff's expert opines that Dr. Patel's failure to act or attempt to contact Dr. Clarke or anyone from the neurology department, after reviewing the Patient's elevated BP vitals, constituted a departure from the accepted standard of care. Plaintiff's expert further notes that the failure of Dr. Patel—who had been on Patient's case since at least 11:34 p.m., on October 1—to ensure that the ordered CTA was performed in a timely manner represented a departure of accepted medical practice, which also deprived Patient of a chance for a better outcome.

Plaintiff's expert opines that some of the Patient's injuries[3] were directly attributable to Dr. Clarke's failure to ensure that that the CTA was performed along with the head CT at around 10:00 p.m. on October 1, as well as the failure of Dr. Patel to ensure that the orders in place for the CTA were carried out, to monitor his

---

[2] CTA was ordered at 10:15 p.m. October 1, 2019, but was not performed until 1:27 a.m. on October 2, 2019, and resulted at 2:48 a.m. on October 2019 (*see* Exhibit L, at.33-34).

[3] The injuries recorded by Dr. Clarke when he saw the patient between 6:30 and 7:40 a.m., on October 2, were the following: "global aphasia, left gaze deviation, right central facial weakness, 0/5 motor strength in the right upper extremity and 1/5 strength in the right lower extremity. His impression was that of an acute left MCA stroke, s/p IV thrombolysis."

9

[* 9]

patient, or ensure that the staff in the ED continue vigilant monitoring of the Patient upon his return from the CT suite at 2:07 a.m. He further opines that these departures from accepted medical and hospital practice caused and/or contributed to the injuries sustained by Patient, specifically by delaying Patient's transfer to a tertiary center, thus diminishing his chances for a better outcome.

As an initial matter, Defendants argue that Plaintiff's expert incorrectly stated the CTA should have been completed "by 10:00 p.m." to fall within the standard of care, which is inconsistent with the record that the initial CT scan was not completed until 10:12 p.m. Based upon the contents of the affirmation, the point made by Plaintiff's expert is that the CTA should have been performed shortly after the CT scan, and that not doing so represents a departure in accepted medical practice. The Court finds the misstatement on one page is not fatal to the issues of fact raised by plaintiff.

In conclusion, Plaintiff raises triable issues of fact as to Dr. Clarke and Dr. Patel's claimed failure to diagnose and treat Patient's stroke in a timely manner. Plaintiff raises a question of fact as to whether Dr. Clarke failed to ensure the timely performance of the CTA or inquire of the CTA's status when he spoke to Dr. Ostrovsky and Dr. Michael on the phone, after the completion of the head CT and administration of tPA, represented a departure from accepted medical practice. Second, a question of fact is raised as to whether the claim that Dr. Patel failed to adequately monitor Patient in the MICU, after tPA was administered, represented a departure from accepted practice. In addition, the expert raises an issue of fact as to whether Dr. Patel's alleged failure to act when Patient's BP was markedly elevated at 171/102, around 4:00 a.m. on October 2, 2019, represented a departure from accepted medical practice.

Further, Plaintiff's expert opined in detail that these medical departures were a proximate cause of Patient's injuries, resulted in a delay in Patient's transfer to a tertiary center, and diminished the Patient's chance

10

[* 10]

for a better outcome while movants' expert's opinions were also conclusory on causation.

Accordingly, Dr. Clarke and Dr. Patel's motion for summary judgment is denied. It is hereby:

**ORDERED** that Dr. Clarke and Dr. Patel's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing all claims and causes of action against said defendants is **DENIED.**

This constitutes the decision and order of this Court.[4]

**ENTER.**

_____

**Hon. Consuelo Mallafre Melendez**
**J.S.C.**

---

[4] This decision was drafted with the assistance of legal intern Philipine Mariaud, Brooklyn Law School.

11